UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 8:18-cr-525-T-30TGW

HENRY BONILLA ARIAS,
ORLANDO VICTORIA VALOY, and
GERLIN RUTILIO IBARGUEN VALENCIA,

      Defendant.

_____/

**DEFENDANT GERLIN IBARGUEN VALENCIA'S SENTENCING MEMORANDUM**

      Comes Now, the Defendant, GERLIN RUTILIO IBARGUEN VALENCIA, by and through undersigned counsel, and hereby files this Sentencing Memorandum in advance of the sentencing proceeding scheduled for July 10, 2019.  Mr. Ibarguen Valencia entered a plea of guilty to Counts One and Two of the Indictment charging him with conspiracy to possess with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1), 70506 (a) and (b) and 21 U.S.C. § 960(b)(1)(B)(ii) and aiding and abetting the substantive offense thereof.  (doc. 57).  For the reasons set forth below, Mr. Ibarguen Valencia prays the Court show leniency and sentence him to 87 months imprisonment.

      **I.**      **BACKGROUND**

      Mr. Ibarguen Valencia is from a rural area of western Colombia in the Department of Choco (a Department is like a state in the United States) to the northwest of Cali.  His family had a small plot of land in the mountains where they grew the food on which they lived.  Mr. Ibarguen Valencia had little contact with his father growing up.  His father had two other

families to which he shared his time.  Mr. Ibarguen Valencia lived with his mother and siblings and spent his time helping his mother tend the field or doing other chores.  He has never been to school and does not read or write in any languages.  His sisters who lived with other families taught him to write his name.  His mother had an unknown disease, and she was frequently ill, so the children had to do most of the labor harvesting beans, rice, and bananas on which the family lived.  The land on which they resided was also where his mother grew up.  It is unclear whether Mr. Ibarguen Valencia's mother actually owned this land or whether her family just settled there.

Mr. Ibarguen Valencia's family built their home as they had to be self-sufficient in everything.  They never sold any of their crops as they only grew enough to feed their family. The family occasionally earned money doing jobs for other people.  When Mr. Ibarguen was five years old, he worked harvesting rice on other people's land for about 1,000 pesos a day which is the equivalent of 30 U.S. cents.  He also worked cutting lumbar.  When he was twelve, he was struck by a large branch while cutting trees.  Since then, at times he experiences the visual sensation that everything is disappearing in front of him, facial paralysis, strong headaches, and ringing in the ears.

During much of Mr. Ibarguen Valencia's life, there was a great deal of violence in his region by paramilitary groups such as the ELN and FARC.  When he was younger, the paramilitary groups tried to take him, but he was able to avoid it.  Eventually, when Mr. Ibarguen Valencia was an adult, the violence in the region became so bad that Mr. Ibarguen Valencia and his family were forced to flee their land along with many other refugees.   The government of Colombia established a program to assist refugees, and the government relocated Mr. Ibarguen Valencia and his family to Cali.

With no education and only the skills he learned as a rural farmer, Mr. Ibarguen Valencia did everything he could to find odd jobs to support his family. He worked on and off as a construction assistant earning about ten U.S. dollars a day. He and a group of friends would also cut lumber and sell it by the inch. If they could accumulate eighty pieces of lumbar, the group could make about 300 U.S. dollars which they split amongst the group. He would also take jobs as a fisherman earning about ninety U.S. dollars a week if the fishing was good.

In the four months preceding this offense, Mr. Ibarguen Valencia was unemployed. He could not find any work in construction. He tried cutting lumber, but on their last job, the contractors for whom they were cutting the wood did not pay them and stole the wood. Mr. Ibarguen Valencia's parents had advanced in age by this point, so Mr. Ibarguen Valencia was paying the rent for his parents and his own family. The stress of having no work also caused Mr. Ibarguen and his wife to separate. He had started drinking daily as a means of coping with his distressing situation. In Mr. Ibarguen's prior period as a farmer, his family never worried about paying rent or bills as they had none. They lived a simple existence, growing the food they ate and living in the shelter they built. Life in Cali offered a more modern life, but also more strife.

In October 2018, a friend told Mr. Ibarguen Valencia about a potential job in Buenaventura fixing a boat engine. Mr. Ibarguen Valencia had no formal mechanical training, but he had learned to fix engines over the years. He took the bus from Cali to Buenaventura where he met the boat owner. Mr. Ibarguen Valencia was able to repair the engine and the owner paid him 50,000 pesos (about $15). Pleased with Mr. Ibarguen Valencia's skill, the owner offered him another job running an "errand" for which he could make significantly more money. Mr. Ibarguen Valencia was not naïve and knew what this proposal likely entailed. He

took some time to think about it; time that only reminded him of how desperate he was and how his parents and family were counting on him. He returned later that night and accepted the job. Now, months later, he stands before the Court to accept his punishment. When Mr. Ibarguen Valencia took that job, he thought to himself that his life could not get any worse. He was wrong.

## II.     18 U.S.C. § 3553(A) FACTORS

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (citing *Koon v. United States*, 518 U.S. 81, 113, 116 (1996)). As is the case with nearly every federal offense, the nature and circumstances of Mr. Ibarguen Valencia's offense are serious. And, at the time he agreed to take the trip, he did not fully appreciate the seriousness. From Mr. Ibarguen Valencia's perspective, he thought he had no other choice. That type of rationalization is easier to accept in one's mind at a time of personal turmoil. Desperation clouded his judgment. His decision was neither wise nor commendable, but the judgments of desperate people are often regrettable. Under Section 3553(a) a sentencing court may properly consider a defendant's motive in mitigation of the sentence. *United States v. Ranum*, 2005 WL 161223, *5 (E.D.Wis. 2005) (citing *Wisconsin v. Mitchell,* 508 U.S. 476, 485 (1993)). As the Supreme Court recently reiterated, "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (citations omitted).

If a person's "immediate misconduct" should ever be "assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs

4

in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006).  Mr. Ibarguen Valencia has not had an easy life.  From the time when most children are just starting school, he labored in the mountains of rural Colombia hoping to harvest enough food to feed his family.  He never had the opportunity for education and cannot read or write.  Then, when the violence of guerilla groups displaced him to a city and a life where he had to earn a living with none of the education or training of someone who grew up in that environment, he struggled.  There was no demand for rice and bean farmers in Cali.  To his credit, Mr. Ibarguen Valencia got by through various labor jobs until an extended period of unemployment deteriorated his marriage and put his family in jeopardy of being out on the streets.  He took the only job that was offered to him.  One that will cost him way more than he ever hoped to earn.

Although Mr. Ibarguen Valencia has little knowledge of the United States legal system nor any allegiance to this country, he has always been respectful of the process, respectful and courteous to his attorney and the agents with whom he met, and has been a model inmate.  He has not displayed any characteristics evincing a threat to the public outside of his conduct in this case or that he is beyond rehabilitation.  *See, e.g., United States v. Sayad*, 589 F.3d 1110, 1118-1119 (10th Cir. 2009) (finding downward variance reasonable where defendant was "good candidate for rehabilitation" based on defendant's recognition of seriousness of offense, strong family support, letters from the community, and lack of drug or sociopathic problems).

Mr. Ibargen Valencia is frightened about what the future holds, and he is heartbroken that he has left his family to subsist without his help. A just punishment in this situation must take into account that Mr. Ibarguen Valencia has also been punished in ways other than the traditional prison sentence. He will be incarcerated in a foreign country where he knows no one. He has essentially been cut off from his family and friends.  His family will likely never visit

him during his incarceration.  And, when he is eventually released, he has no assurances that his family will be waiting for him.

While it is impossible to divine at what threshold a particular sentence will have a deterrent effect on Mr. Ibarguen Valencia and the community at large, a sentence of 87 months will not have any less deterrence than a sentence of 120 months or more.  An outsider viewing Mr. Ibargen Valencia's situation would not conclude he escaped penalty or that his life has not been substantially impacted by imprisonment in a foreign country for over seven years. Certainty of punishment is a much better deterrent than severity. *See* Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011) (deterrence is achieved with certainty of punishment, not its severity); *see also* Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010)([I]in virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity).

The Government's interest in discouraging people like Mr. Ibarguen Valencia from participating in narcotics transportation is strong.  However, a sentence of 87 months is a significant deterrent.  Mr. Ibarguen Valencia has never been to prison so it is an eternity to him. The cost on U.S. taxpayers to incarcerate Mr. Ibarguen Valencia outweighs the necessity of a greater punishment.

While prison does indeed prevent crime while people are locked up, once released, incarceration has, at best, a negligible impact on crime prevention and, at worst, is crime-producing.  COMMUNITY CORRECTIONS COLLABORATIVE NETWORK, MYTHS & FACTS: WHY INCARCERATION IS NOT THE BEST WAY TO KEEP COMMUNITIES SAFE 10 (2016).  Lengthy imprisonment without some offender specific reason not only burdens government budgets, but

also fails to enhance public safety.  VALERIE WRIGHT, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT, November 2010, at 9. Yet, the longer Mr. Ibarguen Valencia's sentence, the more life will pass him by, he will become institutionalized, and his transition back to society will be more difficult.  *See United States v. Hawkins,* 380 F.Supp.2d 143, 165 (E.D.N.Y. 2005), *aff'd,* 228 Fed.Appx. 107 (2d Cir. 2007) (concluding that incarceration "will in effect doom her.... Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment.").

When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Lin Song and Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served*, OLYMPIA, WA: WASHINGTON STATE INSTITUTE OF PUBLIC POLICY (1993). Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.  Thomas Orsagh and Jong-Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, JOURNAL OF QUANTITATIVE CRIMINOLOGY, 4(2):155-171, 1988.  There is not a significant benefit to deterrence by increasing the severity of sentences by imposing longer prison terms.  *See* Wright, *supra* at 9.  Rather, research shows that increasingly lengthy prison terms are counterproductive. *Id*.

Mr. Ibarguen Valencia would benefit from educational and work opportunities, and he intends to take advantage of programs offered at his prison facility.  Mr. Ibarguen Valencia finds himself in this situation because he did not have the education or skills to earn enough money to support his family.  Learning to read and write, learning English, and adding job skills

would help Mr. Ibarguen Valencia support his family and keep him from turning to crime for employment. Although prison may offer Mr. Ibarguen Valencia opportunities to improve himself, he will likely be able to accomplish that during a sentence of 87 months. A longer sentence will only deteriorate his ability to transition back to society.

Mr. Ibarguen Valencia badly wants to work during his incarceration so he can send money to his family. Not all prison facilities offer work opportunities, and some give preference to U.S. citizens for open jobs. Mr. Ibarguen Valencia respectfully requests the Court recommend a facility where he would have work opportunities such as Ft. Dix.

In addition to the headaches and other symptoms from his childhood head injury, while incarcerated, Mr. Ibarguen Valencia suffered from a series of heart related episodes. It was determined that he has an irregular heartbeat amongst other problems. He has also been suffering unexplained nosebleeds. Mr. Ibarguen Valencia requests the Court recommend that he receive medical treatment for these conditions during his incarceration.

Although he wanted to help his family, Mr. Ibarguen Valencia is aggrieved by knowing his transgression actually put his family in a worse position than before his offense. Prior to Mr. Ibarguen Valencia's arrest his family was very poor. Now, they have even lost the meager wages he provided. The Bureau of Prisons will provide Mr. IBarguen Valencia with a roof, a bed, and food. Unfortunately, Mr. Ibarguen Valencia's family will bear the burden of his incarceration as they slip deeper into poverty. *See United States v. Jebara*, 313 F.Supp.2d 912, 917 (E.D.Wis. 2004) (departure warranted to avoid "needless suffering" of family). Mr. Ibarguen Valencia asks the Court to take his personal circumstances in account when determining an appropriate sentence.

### III.     THE SENTENCING GUIDELINES

#### A.   *Safety Valve*

As of the filing of this memorandum, the parties dispute whether Mr. Ibarguen Valencia has satisfied the debriefing requirement under 18 U.S.C. § 3553(f)(5) for safety valve relief. As the Court is aware, in addition to relief from the mandatory minimum in boat cases pursuant to the newly enacted First Step Act, safety valve also carries a two level offense level reduction pursuant to USSG § 2D1.1(b)(18).

As counsel understands the dispute, the Government believes Mr. Ibarguen Valencia has not disclosed everything he knows about the individual who recruited him for this venture. The Government has not provided counsel with any evidence that Mr. Ibarguen Valencia knows more than he has disclosed and the Presentence Report offers no details or substantiation for the conclusion that safety valve is inapplicable.

Given the sensitivity of the Government's investigation, this publicly filed memorandum is not the appropriate forum to recite Mr. Ibarguen Valencia's narrative, but counsel can provide a description of Mr. Ibarguen Valencia's statement under seal in advance of the sentencing hearing if the Court wishes.  In any event, if the Government objects to safety valve relief, Mr. Ibarguen Valencia requests the Court conduct a hearing pursuant to *United States v. Espinosa*, 172 F.3d 795 (11th Cir.1999), to determine whether Mr. Ibarguen Valencia has satisfied the debriefing requirement under 18 U.S.C. § 3553(f)(5).

The determination of safety valve is not committed to the discretion of the government. *Krecht v. United States*, 846 F. Supp. 2d 1268, 1287 (S.D. Fla. 2012).  "The government cannot assure success simply by saying, 'We don't believe the defendant,' and doing nothing more." *United States v. Miranda-Santiago*, 96 F.3d 517, 529 (1st Cir. 1996).  The responsibility for

determining the truthfulness of the information the defendant provided is with the district court and is not deferred to the Government. *Espinosa*, 172 F.3d at 797.

A defendant need only disclose information within his knowledge. *United States v. Figueroa*, 199 F.3d 1281, 1283 (11th Cir.2000); *see also* 18 U.S.C. § 3553(f)(5) (fact that defendant lacks "relevant or useful" information, or information "the Government is already aware of," does not disqualify defendant from compliance). Also, a defendant need not volunteer information on matters collateral to the offense. *Krecht*, 846 F. Supp. 2d at 1287. Section 3553(f)(5) does not invite speculation or conjecture regarding a defendant's knowledge. *Miranda-Santiago*, 96 F.3d at 529. While it is entirely possible that a minor participant in the criminal activities might know more than his designated role suggests, the government must offer concrete evidence to so indicate. *Id*. The completeness or truthfulness of a defendant's proffer must be contradicted by evidence. *United States v. Alvarado-Rivera*, 386 F.3d 861, 869 (8th Cir. 2004), *on reh'g en banc*, 412 F.3d 942 (8th Cir. 2005).

The safety valve provision requiring the defendant to provide truthful information about the offense need not rise to the level of substantial assistance necessary to support a § 5K1.1 motion. *Krecht*, 846 F. Supp. 2d at 1286 (citing *United States v. Montanez*, 82 F.3d 520, 522 (1st Cir. 1996); 1 Practice Under the Federal Sentencing Guidelines § 2.05[D][2] (citing cases)). The purpose of safety valve is to remedy the sentencing inequity of allowing high-level defendants, whose greater participation in criminal activity resulted in their having more information, to qualify for substantial assistance whereas low-level defendants with little knowledge have nothing of interest to the Government. *United States v. Madrigal*, 327 F.3d 738, 743 (8th Cir. 2003). "[T]he government cannot legitimately claim to depend on a safety valve proffer as a source of information about the crime" as that is not its purpose. *United*

10

*States v. Schreiber*, 191 F.3d 103, 108 (2d Cir. 1999).  Mr. Ibarguen Valencia did not qualify for a substantial assistance reduction in this case, but his account of his participation in this offense is sufficient to qualify for safety valve relief.

> B.  *Minor Role*

Mr. Ibarguen Valencia requests the Court impose a downward departure for minor role pursuant to USSG § 3B1.2.  Pursuant to *United States v. Cruickshank*, No. 14-13754 (11th Cir. 2016), a defendant in Mr. Ibarguen Valencia's position is eligible for a role adjustment. The recent clarification to USSG § 3B1.2 provides that "[f]or example, a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline."  U.S.S.G. Supp. App. C, Amend. 794.  And, as Application Note 3(A) to USSG § 3B1.2 states:  "For example, a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored, may receive an adjustment under this guideline."  Those examples encapsulate Mr. Ibarguen Valencia's role in this offense.

Mr. Ibarguen Valencia's participation in the offense satisfies nearly all of the non-exhaustive list of factors found in Application Note 3(C) of § 3B1.2.  Mr. Ibarguen Valencia had little understanding of the scope and structure of the criminal activity.  He only knew enough to allow him to perform the specific tasks he was directed to perform.  He did not recruit anyone to join the activity and was himself recruited by someone else.  He was not responsible for obtaining the drugs, nor was he aware of where they came from, who owned them, the amount, or their ultimate destination.  He had no idea how these drugs were to reach the United States.  To this day he would not know the quantity of drugs without reviewing the discovery

provided by the Government. He did not obtain the boat, choose the course, or prepare the boat for the journey. He had no involvement in planning or organizing even the most basic activities associated with the activity. He had no decision-making authority or influence over any other person. In fact, if he had deviated in any way from the instructions given to him, he likely would have been harmed. In his role as a crew member, he had no discretion over how the drugs were to be transported, the route, the individuals he would work with, or any other details associated with moving something from one location to another. He was to be paid for being a crew member on the boat and had no proprietary interest in the purchase or sale of any of the drugs.

Like *Cruickshank*, while the amount of drugs in this case is substantial, "there is nothing in the record to suggest that the amount of drugs was indicative of the magnitude of [the defendant's] participation in the crime -- to the contrary, he did not load the drugs on the vessel, reconstruct the vessel, fuel the vessel, attend the planning meetings for the trip, or otherwise appear to have any role concerning the quantity of drugs." *United States v. Cruickshank*, 14-13754 at 21 n. 1. The amount of drugs involved in this case was not something over which Mr. Ibarguen Valencia had any control and does not distinguish this case from *Cruickshank*.

Even if Mr. Ibarguen Valencia's role could be considered important to the success of the venture, such a factor is not determinative. U.S.S.G. Supp. App. C, Amend. 794. Nearly every job associated with a criminal enterprise, or even a legitimate enterprise, could be considered important to some aspect of the enterprise, otherwise the job would not exist. Someone above Mr. Ibarguen Valencia organized and funded this voyage, obtained the drugs and the boat, mapped the course, loaded the boat, determined a launching and docking spot,

and recruited the people to fill the multiple jobs required to accomplish the voyage.  Mr. Ibarguen Valencia played his part, but it was a small part in comparison.

If the Court does not find Mr. Ibarguen Valencia qualifies for a departure for any of these reasons under the rigid framework of the guidelines, Mr. Ibargen Valencia asks the Court to consider his lesser role in conjunction with other mitigating factors and grant him a variance from his guidelines sentence.  "[A]fter *Booker,* a district judge can fairly consider policy statements concerning departures and fairly decide to impose a non-Guidelines sentence without definitively resolving close questions regarding the precise meaning or application of a departure policy statement."  *United States v. Canova*, 412 F.3d 331, 358 n. 28 (2d Cir. 2005).

### IV.     REQUEST FOR VARIANCE

Following *Gall v. United States,* there is no requirement of "'extraordinary' circumstances to justify a sentence outside the Guidelines range."  552 U.S. 38, 47 (2007). Subject to review for reasonableness, district judges are now free to apply their own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the guidelines. *United States v. Rodriguez*, 406 F.3d 1261, 1289 (11th Cir. 2005) (Tjoflat, J., dissenting) (citing *Booker*, 125 S.Ct. at 790 (Scalia, J., dissenting)).

Mr. Ibarguen Valencia is an exceedingly poor person who made a bad decision in the face of desperate financial circumstances.  He deserves to be punished, but he also deserves some measure of mercy.

Without any of the above requested reductions to Mr. Ibarguen Valencia's Guideline Offense Level of 35, his Guideline range is 168-210 months, a sentence at the low end which would well exceed the sentence typically afforded a similarly situated crew member.  Mr.

Ibarguen Valencia respectfully requests the Court vary to a level 29 and sentence him to the low end of 87 months imprisonment.

With the First Step Act's extension of safety valve to these maritime cases, the sentences for crew members have become less standardized. For example, in case no. 8:18-cr-510-T-35JSS, a group of three mariners received sentences of 46, 46, and 51 months imprisonment respectively. (doc. 67, 79, 85). In this case, Mr. Ibarguen Valencia's Codefendants have received sentences of 120 and 180 months. (doc. 65, 68). Mr. Ibarguen Valencia's request of 87 months is in the mid-range of those sentences.

In order for the cocaine on Mr. Ibarguen Valencia's vessel to reach the United States, there were probably hundreds of people involved in that process from the people who originally grew it to the people who would take the cocaine from Mr. Ibarguen Valencia's boat and transport it through Central America and Mexico. If all of those people were now standing before the Court, Mr. Ibarguen Valencia would be amongst the least culpable. He is simply the only one who has been caught.

Mr. Ibarguen Valencia did not own these drugs and stood to gain only the agreed upon payment to make this trip. A payment he desperately needed to support his family. It was wrong, but people in his position will continue to make this mistake as long as they have to choose between committing a crime or letting their families toil in poverty. To date, life has not been particularly lenient to Mr. Ibarguen Valencia from growing up as a penniless rice farmer, to being displaced by guerilla violence, to his present impoverished circumstances. Mr. Ibarguen Valencia asks the Court to show leniency on him and sentence him to 87 months imprisonment. "[T]he punishment should fit the offender and not merely the crime." *Pepper*,

131 S.Ct. at 1240 (citations omitted).  Such a sentence is sufficient, but not greater than

necessary, to satisfy the 18 U.S.C. § 3553(a) criteria and to accomplish the goals of sentencing.

Respectfully submitted,

By: /s/ *P. Matthew Luka*
P. MATTHEW LUKA
Florida Bar No.  0555630
TROMBLEY & HANES. P.A.
707 North Franklin Street
10th Floor
Tampa, Florida  33602
Telephone: (813) 229-7918
Facsimile:  (813) 223-5204
mluka@trombleyhaneslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/  *P. Matthew Luka*
P. MATTHEW LUKA

15